## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMRA DIVLJANOVIC, RAMSES CARRANZA, MARK ASKEW, NORA LAJQI, FAYE TAGHAVI, RINA TOLEDANO, MARVIN K. BLAKES, and JUANITA V. PARKS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> SAKS & COMPANY d/b/a SAKS FIFTH AVENUE <br><br> Defendant. | Case No. 2014-cv-7533 |

## DEFENDANT SAKS & COMPANY'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO STRIKE THE CLASS ALLEGATIONS
## IN PLAINTIFFS' SECOND AMENDED COMPLAINT

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800 (telephone)
(212) 808-7898 (facsimile)

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT .......................................................................1

II.   STATEMENT OF FACTS & PROCEDURAL HISTORY ................................2

    A.    Procedural History .................................................................................2

    B.    The Named Plaintiffs ..............................................................................3

        1.    Amra Divljanovic.........................................................................3

        2.    Ramses Carranza...........................................................................3

        3.    Mark Askew...................................................................................4

        4.    Nora Lajqi .....................................................................................4

        5.    Faye Taghavi .................................................................................4

        6.    Rina Toledano ...............................................................................4

        7.    Marvin K. Blakes ..........................................................................4

        8.    Juanita V. Parks ............................................................................5

    C.    Saks' Business Operations ......................................................................5

        1.    Saks Compensates Sales Associates By a Commission Plan
            Which Expressly States that Returned Merchandise Will Reduce Their
            Commissions...................................................................................5

        2.    How Returned Merchandise Reduces Commissions Depends on
            Highly Individualized Factors.......................................................6

        3.    The Amount of Returns, and Whether Returns Actually Reduce
            Commissions, Are Impacted By Highly Individualized Factors ...............7

        4.    Directors Have Individual Discretion to Adjust Commissions....................7

III.  ARGUMENT.................................................................................................9

    A.    Plaintiffs Are Not Entitled to Certification Under Rule 23 .....................9

        1.    Plaintiffs' Section 193 Claim Requires Individualized Proof....................9

        2.    Plaintiffs' "Minimum Wage" Claim Requires Individualized
            Proof and Cannot Satisfy the Commonality, Typicality, and
            Predominance Requirements Either........................................................18

    B.    Plaintiffs are Not Entitled to Conditional Certification of a Collective Action
        Under the FLSA.....................................................................................19

        1.    Plaintiffs Are Not Similarly Situated to the Putative Collective
            Action Members Because They Fail to Demonstrate the Existence
            of a Common Unlawful Policy or Practice ................................................21

IV.   CONCLUSION..............................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Basco v. Wal-Mart Stores, Inc.*,
No. 00-cv-3184, 2004 WL 1497709 (E.D. La. July 2, 2004) ...................................................24

*Baum v. Great W. Cities, Inc. of N.M.*,
703 F.2d 1197 (10th Cir. 1983) ...........................................................................................11

*Caridad v. Metro-North Commuter R.R.*,
191 F.3d 283 (2d Cir. 1999)...............................................................................................12

*Clay v. Huntington Ingalls, Inc.*,
No: 09-cv-7625, 2011 U.S. Dist. LEXIS 155351 (E.D. La. Sept. 29, 2011)...........................22

*Connolly v. McCall*,
254 F.3d 36 (2d Cir. 2001).................................................................................................11

*D'Anna v. M/A-Com, Inc.*,
903 F. Supp. 889 (D. Md. 1995) ....................................................................................20, 21

*Debose v. FedEx Corp.*,
No. 08-cv-07042, 2009 WL 1542572 (S.D.N.Y. June 2, 2009) .............................................11

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006)...............................................................................................12

*Doucoure v. Matlyn Food, Inc.*,
554 F. Supp. 2d 369 (E.D.N.Y. 2008) .................................................................................20

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
No. 09-cv-4968, 2010 WL 2428083 (S.D.N.Y. June 17, 2002) .............................................17

*Fedotov v. Peter T. Roach and Assocs., P.C.*,
354 F. Supp. 2d 471 (S.D.N.Y. 2005)..................................................................................11

*In re Fosamax Prods. Liability Litig.*,
248 F.R.D. 389 (S.D.N.Y. 2008) ........................................................................................15

*Gaston v. Exelon Corp.*,
247 F.R.D. 75 (E.D. Pa. 2007)............................................................................................16

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982)..........................................................................................................12

*H&R Block v. Housden*,
186 F.R.D. 399 (E.D. Tex. 1999)........................................................................................20

*Hoffman-La Roche, Inc. v. Sperling*,
   493 U.S. 165 (1989)........................................................................21

*Holzapfel v. Town of Newburgh*,
   145 F.3d 516 (2d Cir. 1998).........................................................23

*Indergit v. Rite Aid Corp.*,
   293 F.R.D. 632 (S.D.N.Y. 2013) ...................................................15

*In re Initial Public Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)...........................................................12

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001)..........................................................23

*Lizondro–Garcia v. Kefi LLC*,
   300 F.R.D. 169 (S.D.N.Y. 2014) ...................................................16

*Lynch v. United Servs. Auto Ass'n*,
   491 F. Supp. 2d 357 (S.D.N.Y. 2007)............................................20

*Mantolete v. Bolger*,
   767 F.2d 1416 (9th Cir. 1985) ......................................................11

*Monahan v. County of Chesterfield*,
   93 F.3d 1263 (4th Cir. 1996) ........................................................24

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)........................................................17

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)...........................................16, 19, 20

*Pachter v. Bernard Hodes Group, Inc.*,
   10 N.Y. 3d 609 (N.Y. Ct. App. 2008)......................................9, 10, 12

*Palmer v. Readers Digest Ass'n*,
   No. 84-cv-8397, 1986 WL 11458 (S.D.N.Y. Oct. 3, 1986)....................20

*Patton v. Thompson Corp.*,
   364 F. Supp. 2d 263 (E.D.N.Y. 2005) ...........................................20

*Pelczynski v. Orange Lake Country Club, Inc.*,
   284 F.R.D. 364 (D.S.C. 2012) ......................................................22

*Perez v. Westchester Foreign Autos, Inc.*,
   No. 11-cv-6091, 2013 U.S. Dist. LEXIS 35808 (S.D.N.Y. Feb. 28, 2013)............................24

*Prizmic v. Armour, Inc.*,
    No. 05-cv-2503, 2006 WL 1662614 (E.D.N.Y. June 12, 2006)........................................20, 21

*Puffer v. Allstate Ins. Co.*,
    255 F.R.D. 450 (N.D. Ill. 2009)..............................................................................................16

*Ray v. Motel 6 Operating, Ltd. P'ship*,
    No. 3-95-828, 1996 U.S. Dist. LEXIS 22564 (D. Minn. Mar. 18, 1996)...............................21

*Reich v. New York City Transit Auth.*,
    45 F.3d 646 (2d Cir. 1995)......................................................................................................23

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993)..............................................................................................15, 19

*Roebuck v. Hudson Valley Farms, Inc.*,
    239 F. Supp. 2d 234 (N.D.N.Y. 2002)....................................................................................21

*In re Starbucks Employee Gratuity Litig.*,
    264 F.R.D. 67 (S.D.N.Y. 2009) ........................................................................................13, 17

*Stott v. Haworth*,
    916 F.2d 134 (4th Cir. 1990) ..................................................................................................15

*Thompson v. Merck & Co.*,
    No. 01-cv-1004, 2004 WL 62710 (E.D.Pa. Jan. 6, 2004)........................................................11

*Tongo v. Derwinski*,
    No. 90-cv-4986, 1991 WL 243421 (S.D.N.Y. Nov. 14, 1991).................................................11

*Ulvin v. Northwestern Nat'l Life*,
    No. 3-88-730, 1991 U.S. Dist. LEXIS 17842 (D. Minn. Aug. 8, 1991)..................................21

*United States v. Klinghoffer Bros. Realty Corp.*,
    285 F.2d 487 (2d Cir. 1960)....................................................................................................24

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ....................................................................................13, 14, 15

*Wal–Mart Stores, Inc. v. Dukes*,
    ⸺ U.S. ⸺, 131 S.Ct. 2541 (2011)....................................................................................13, 16

*Wallace v. Norcross Assocs., LLC*,
    No 13-cv-1349, 2014 WL 1373659 (N.D. Ga. Apr. 8, 2014)..................................................22

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*,
    226 F.R.D. 446 (S.D.N.Y. 2005) ............................................................................................18

*West v. Border Foods, Inc.,*
   No. 05-cv-2325, 2006 WL 1892527 (D. Minn. July 10, 2006) ...............................................21

**Statutes**

29 U.S.C. § 254 ...............................................................................................................................23

29 U.S.C. § 216(b) ..........................................................................................................................20

Fair Labor Standards Act (FLSA) ..................................................................................... *passim*

FLSA, 29 U.S.C. §201 *et seq.* .........................................................................................................17

New York Labor Law (NYLL) .......................................................................................... *passim*

NYLL § 193 ...................................................................................................................... *passim*

NYLL § 190(1) ..................................................................................................................................9

NYLL § 193(1)(a) .............................................................................................................................9

NYLL § 193(1)(b) .............................................................................................................................9

**Other Authorities**

29 C.F.R. § 779.419 .........................................................................................................................3

Federal Rule of Civil Procedure 23 .................................................................................... *passim*

Federal Rule of Civil Procedure 23(a) ....................................................................................12, 16

Federal Rule of Civil Procedure 23(a)(2) ......................................................................................16

Federal Rule of Civil Procedure 23(b) ..........................................................................................12

Federal Rule of Civil Procedure 23(b)(3) ......................................................................................16

Defendant Saks & Company d/b/a Saks Fifth Avenue ("Saks" or "Defendant"), submits this memorandum of law in support of its Motion to Strike the Class Allegations in Plaintiff's Second Amended Complaint ("SAC").

## I.    PRELIMINARY STATEMENT

Superficial changes aside, the SAC picks up where Plaintiffs' first Complaint left off, and thus fails to cure the deficiencies that make Plaintiffs' claims unsuitable for class treatment.[1]

Plaintiffs' putative *class* claims for unlawful deductions under New York Labor Law ("NYLL") § 193 still depend entirely on *individualized* proof. Indeed, the New York Court of Appeals notes that § 193 wage claims such as Plaintiffs,' necessarily involve individualized proof: the subjective intent of each putative class member would have to be established to prove an implied agreement with Saks that sales returns would not reduce commissions – despite a written agreement that says otherwise. This, in turn, would require individualized inquiries into whether, and how, hundreds of putative class members acquiesced over many years to a commission system that Plaintiffs now say was somehow contrary to each sales employee's understanding – and all this before we could understand whether any such person even belongs in the proposed class. Plaintiffs' NYLL § 193 claims therefore cannot be typical of all putative class members, and individual issues of fact and law predominate over common ones.

In addition, because deductions are taken from commissions under a variety of individualized circumstances, Plaintiffs' theory of class-wide liability would necessitate a determination of every instance in which any allegedly unlawful deduction was made with respect to every putative class member in order to determine class membership in the first place.

---

[1]     Saks moves to strike the class allegations because Plaintiffs' claims are not subject to class treatment as a matter of law. In doing so, Saks reserves the right to make additional arguments in response to any Motion for Class Certification later filed by Plaintiffs if this Court denies the instant motion.

It is this classic "cart before the horse" problem that makes a fail-safe class inappropriate for certification. Accordingly, the class allegations in the SAC as they relate to NYLL § 193 should be stricken.

The SAC also purports to bring a "minimum wage" claim for time Plaintiffs were allegedly required to work off the clock. This claim is properly analyzed as an "off-the-clock" claim under the Fair Labor Standards Act ("FLSA"). The SAC alleges no common policy at Saks of requiring employees to work off the clock; rather, it refers to particular instances in which Saks allegedly required the named Plaintiffs to work off the clock. Thus, class membership would depend entirely on individualized findings as to whether each and every putative class member was ever required to work off the clock and, if so, when, and for how long. And, given the *ad hoc* nature of the off-the-clock work alleged, no particular employee's experience would be representative of that of any other particular employee, let alone of the whole class.

For these reasons and as set forth herein, Plaintiffs' claims remain hopelessly individualized at their core, and the class allegations should be stricken from the SAC.

## II. STATEMENT OF FACTS & PROCEDURAL HISTORY

### A. Procedural History

Plaintiffs' First Amended Complaint alleged two kinds of claims: (i) failure to pay overtime under the FLSA and the NYLL; and (ii) an unlawful deduction claim under NYLL § 193 based on so-called "unexplained returns." Plaintiffs filed a Motion for Certification of a Class under Federal Rule of Civil Procedure 23 and for Conditional Certification under the FLSA. (Dkt. No. 20) ("First Motion to Certify"). Saks opposed the motion on a variety of grounds. (Dkt. No. 33). In reply to, and during oral argument on, their Motion, Plaintiffs withdrew their overtime claim, conceding that Plaintiffs were exempt from overtime under the FLSA's retail sales exemption. (Dkt. No. 36).

2

During oral argument, the court also denied Plaintiffs' Motion, without prejudice, in order to allow them to amend the Complaint, which Plaintiffs did on September 9, 2015. (Dkt. No. 44). The SAC removes Plaintiffs' overtime claims, amends Plaintiff's claim for unlawful deductions under Section 193 of the NYLL, and adds a claim for failure to make minimum wage payments for alleged off-the-clock work under the NYLL and FLSA. None of these claims are appropriate for class treatment.

**B.     The Named Plaintiffs[2]**

1.     **Amra Divljanovic**. Plaintiff Amra Divljanovic was a sales associate at Saks from about November 2004 until about June 2013. (Christ Decl. ¶ 36). Her average annual earnings during the limitations period was $26.74 per hour.[3] (*Id.*). She earned $28.73 per hour in 2008; $29.39 per hour in 2009; $30.79 per hour in 2010; $31.16 per hour in 2011; $22.19 per hour in 2012; and $18.16 per hour in 2013. (*Id.*).

2.     **Ramses Carranza**. Plaintiff Ramses Carranza was a sales associate at Saks from about September 2002 until about June 2012. (Christ Decl. ¶ 37). His average annual earnings during the limitations period was $36.76 per hour. (*Id.*). He earned $42.49 per hour in 2008; $41.89 per hour in 2009; $40.53 per hour in 2010; $33.98 per hour in 2011; and $24.93 per hour

---

[2]     In Defendant's prior opposition to Plaintiffs' First Motion to Certify, Defendant presented Plaintiffs' payroll earning history based on the Company's available records, which show that Plaintiffs have all earned much more than 1.5 times the applicable federal minimum wage. *See http://www.dol.gov/whd/minwage/chart.htm* (last accessed October 15, 2015). For the Court's convenience, the minimum wage and minimum overtime rates applicable to the periods of time analyzed here are:

| Time Period | Minimum Wage | Min. OT Rate (1.5 Times Minimum Wage) |
|---|---|---|
| 9/1/97 through 7/23/07 | $5.15 | $7.73 |
| 7/24/07 through 7/23/08 | $5.85 | $8.78 |
| 7/24/08 through 7/23/09 | $6.55 | $9.83 |
| 7/24/09 through present | $7.25 | $10.88 |

[3]     The analysis of Plaintiffs' annual earnings was done by dividing total annual compensation by number of hours worked, exclusive of any overtime payments paid by Saks. This is known under the FLSA regulations as the "regular rate" of pay.  29 C.F.R. § 779.419.

in 2012. (*Id.*).

3.    **Mark Askew**. Plaintiff Mark Askew was a sales associate at Saks from about March 2007 until about February 2010. (Christ Decl. ¶ 38). His average annual earnings during the limitations period was $23.08 per hour. (*Id.*). He earned $26.08 per hour in 2008; $19.94 per hour in 2009; and $23.22 per hour in 2010. (*Id.*).

4.    **Nora Lajqi**. Plaintiff Nora Lajqi was a sales associate at Saks from about November 2009 until about September 2011. (Christ Decl. ¶ 39). Her average annual earnings during the limitations period was $21.27 per hour. (*Id.*). She earned $25.50 per hour in 2009; $20.12 per hour in 2010; and $18.20 per hour in 2011. (*Id.*).

5.    **Faye Taghavi**. Plaintiff Faye Taghavi joined Saks in May 2007. (Christ Decl. ¶ 40). Her average annual earnings during the limitations period was $34.11 per hour. (*Id.*). She earned $35.06 per hour in 2008; $39.82 per hour in 2009; $47.01 per hour in 2010; $38.31 per hour in 2011; $30.78 per hour in 2012; $23.31 per hour in 2013; and $24.50 per hour in 2014 (through September 20, 2014). (*Id.*).

6.    **Rina Toledano**. Plaintiff Rina Toledano was a sales associate at Saks from about February 2007 until about March 2013. (Christ Decl. ¶ 41). Her average annual earnings during the limitations period was $36.98 per hour. (*Id.*). She earned $49.31 per hour in 2008; $40.46 per hour in 2009; $36.28 per hour in 2010; $38.03 per hour in 2011; $36.41 per hour in 2012; and $21.39 per hour in 2013. (*Id.*).

7.    **Marvin K. Blakes**. Plaintiff Marvin K. Blakes was a sales associate at Saks from about June 1994 until about August 2012. (Christ Decl. ¶ 42). His average annual earnings during the limitations period was $25.18 per hour. (*Id.*). He earned $28.14 per hour in 2008; $25.86 per hour in 2009; $26.50 per hour in 2010; $23.83 per hour in 2011; and $22.59 per hour

4

in 2012. (*Id.*).

**8.** **Juanita V. Parks**. Plaintiff Juanita Parks was a sales associate at Saks from about September 2006 until about October 2012. (Christ Decl. ¶ 43). Her average annual earnings during the limitations period was $22.41 per hour. (*Id.*). She earned $26.38 per hour in 2008; $25.87 per hour in 2009; $21.77 per hour in 2010; $20.77 per hour in 2011; and $17.25 per hour in 2012. (*Id.*).

**C.** **Saks' Business Operations.**

**1.** **Saks Compensates Sales Associates By a Commission Plan Which Expressly States that Returned Merchandise Will Reduce Their Commissions.**

Saks is a department store retailer. Its flagship store, located on Fifth Avenue in New York City, is the subject of this lawsuit. The Fifth Avenue store consists of many separate departments selling different products. (Christ Decl. ¶ 3). Each department is managed by one or more Sales Directors ("Directors"), each of whom manages several sales associates who are the primary customer contacts on the sales floor. (*Id.* ¶ 4).

Saks sales associates are compensated according to the terms of a written commission plan. (Christ Decl. ¶ 5). The commission plan provides that if a product is returned to the store, the commission on that sale is usually, but not always, reduced from the commission earnings of the sales associate who made the sale. (Id. ¶ 16). This makes sense, since Saks does not profit from returned merchandise and therefore does not compensate employees for it.

Saks' written commission plan expressly states that when merchandise is returned by a customer, the commission that the sales associate received for the original sale will be reversed:

> Productivity and earnings are impacted by all returns. When an item is returned and the original sales associate for that item is identified, commission for the sale will be deducted from that associate's earnings at the same rate it was originally paid.

5

(Christ Decl. ¶ 8, Exh. A, at p. 1). Sales associates have been given a copy of the written commission plan when they are hired, and most every year they are employed. (*Id.* ¶¶ 6-7).

### 2. How Returned Merchandise Reduces Commissions Depends on Highly Individualized Factors.

When a purchase is made at Saks, it is recorded in Saks' computer system and is logged with a transaction number and a number identifying the associate who rang up the sale. (Christ Decl. ¶ 22). When a customer returns merchandise, the sales associate processing the return first asks the customer for a receipt. (*Id.* ¶ 23). If the customer presents a receipt, the sales associate enters the information on the receipt into the computer and processes the return. (*Id.*). Because the sale and the sales associate who made it are matched on the receipt, the computer system automatically identifies the appropriate sales associate by transaction number. (*Id.*). Thus, irrespective of who processes the return, the computer system matches the return to the sales associate who originally made the sale, and the commission on that sale is reversed. (*Id.*).

When a customer returns merchandise without a receipt, the sales associate processing the return must search the computer system to find the sale and corresponding transaction number. (*Id.* ¶ 24). This can be done in several ways. (*Id.* ¶¶ 24-26). For example, if the customer paid by credit card, the credit card number can be located in the system and cross-referenced to the merchandise being returned. (*Id.* ¶ 24). If the customer paid with cash but agreed to provide her name and other identifying information at the time of purchase, the sales associate can locate the transaction by way of the customer's identifying information. (*Id.* ¶ 25). If the original sale is matched to the associate who made it, the commission on that sale is reduced.

If the customer paid with cash and did not provide identifying information, Saks' Client Services department may take further steps to identify the transaction and the corresponding associate. (*Id.* ¶ 26). After that, if there is no way to identify the transaction, or the sales associate

who made the sale, the return is processed as a "merchandise credit" to the customer in the amount of the item's lowest selling price. (*Id.* ¶ 27). If a return is processed without a receipt or other means of identifying the original transaction, no one's commission is reduced. (*Id.* ¶ 28).

### 3. The Amount of Returns, and Whether Returns Actually Reduce Commissions, Are Impacted By Highly Individualized Factors.

The number and financial impact of returns vary so widely from sales associate to sales associate that no two associates receive identical compensation. Some sales associates have the misfortune of selling to a "professional shopper" – individuals who buy merchandise and usually return it later. (McCall Decl. ¶ 16). Other clients use shopping as a form of "therapy" and return merchandise once the "high" wears off. (Seltzer Decl. ¶ 18; Bleibdrey Decl. ¶ 14). Returns (and thus commissions) also vary by department, (Speer Decl. ¶ 15; Seltzer Decl. ¶ 18), and time of year. (Speer Decl. ¶ 15; McCall Decl. ¶ 11; Niang Decl. ¶ 16). For instance, there are fewer returns in the suits and bridal departments, (Khan Decl. ¶ 16; Lebron Decl. ¶ 15), and the intimate apparel, cosmetics, and men's departments. (Lebron Decl. ¶ 15; Seltzer Decl. ¶ 18). There are more returns in evening wear, (Seltzer Decl. ¶ 18), when promotional sales are offered, (Speer Decl. ¶ 15; Seltzer Decl. ¶ 18), during the Christmas holiday, (Speer Decl. ¶ 15; Niang Decl. ¶ 16), and around Valentine's Day (Lebron Decl. ¶ 15). Associates engaging in "pressure selling" are more likely to see merchandise returned, (Seltzer Decl. ¶ 19; Bleibdrey Decl. ¶ 14), and longstanding customers are less likely to return merchandise. (Cantone Decl. ¶ 20).

### 4. Directors Have Individual Discretion to Adjust Commissions.

Saks customers sometimes return merchandise for reasons that are wholly outside the control of a sales associate. (Christ Decl. ¶¶ 29-32). For example, alterations are sometimes done incorrectly after a sale is made. (Christ Decl. ¶ 31; Fullmer Decl. ¶ 25; Cantone Decl. ¶ 18; Khan Decl. ¶ 13), or sometimes a product is returned because it is defective. (Christ Decl. ¶ 30). In

these situations, a Director has discretion to allow the sales associate to retain the commission notwithstanding the return. (Christ Decl. ¶¶ 29-32; Whittaker Decl. ¶ 14; Fuller Decl. ¶ 25; Bleibdrey Decl. ¶ 16; Brunelle Decl. ¶ 29; Seltzer Decl. ¶ 15; Khan Decl. ¶ 13). This is referred to as a "productivity adjustment." (Christ Decl. ¶ 29; Whittaker Decl. ¶ 14; Fullmer Decl. ¶25; Bleibdrey Decl. ¶ 16; Brunelle Decl. ¶ 29; Gignac Decl. ¶ 15; Speer Decl. ¶ 13; Cantone Decl. ¶ 18; Seltzer Decl. ¶ 15; Khan Decl. ¶ 13; Niang Decl. ¶ 13).

It is also within the discretion of the Director to approve an unwarranted return – such as when a product is worn but the tag is still on. (Whittaker Decl. ¶ 13; Cantone Decl. ¶ 19). Further, sometimes a commission is adjusted because of an accident – such as when an associates rings a sale under another associate's identification number (Whittaker Decl. ¶ 15; Gignac Decl. ¶ 16; Seltzer Decl. ¶ 17; Khan Decl. ¶ 13; Niang Decl. ¶ 13), when an associate "steals" a sale of another associate, (Brunelle Decl. ¶ 30; Speer Decl. ¶14), or when it is simply fairer to split a commission. (Seltzer Decl. ¶ 16; Niang Decl. ¶ 13). Sales associates are also not always vigilant about monitoring their returns and fail to notify a Director that a productivity adjustment should be made. If the Director is unaware, an adjustment cannot be entered. (Cantone Decl. ¶ 19; Khan Decl. ¶ 13; Speer Decl. ¶ 14; Seltzer Decl. ¶ 17; Niang Decl. ¶¶ 14-15; Bleibdrey Decl. ¶ 16). When Directors exercise their discretion (which itself varies from Director to Director) to carry out a productivity adjustment, these returns do not reduce commissions. (Cantone Decl. ¶ 18; Seltzer Decl. ¶¶ 15-16; Niang Decl. ¶ 13).

III.   <u>ARGUMENT</u>

A.   <u>Plaintiffs Are Not Entitled to Certification Under Rule 23.</u>

    1.   **Plaintiffs' Section 193 Claim Requires Individualized Proof.**

        a.   *Pachter Requires Plaintiffs to Proffer Individualized Proof In Support of Their Section 193 Claims.*

Like the First Amended Complaint, the SAC continues to assert that Saks violated Section 193 of the NYLL by deducting the value of returned merchandise from Plaintiffs' commissions. This claim is simply not susceptible of class-wide resolution.

Under the NYLL, an employer cannot make deductions from "wages."[4] A commission payment is only considered a "wage" when it is "earned," and is only "earned" in accordance with the parties' express or implied agreement. *Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y. 3d 609, 618 (N.Y. Ct. App. 2008). The New York Court of Appeals in *Pachter* confirmed that New York law permits an employer and a commission-based employee to agree on how earnings are calculated, including whether, and what type of, adjustments may be made against commission payments. Thus, as here, it is not unlawful for an employer and employee to agree to reduce commissions based on some factor like returns. To the contrary, the point at which an employee's compensation is deemed "earned" depends upon the express or implied agreement the employee reaches with the employer. Importantly, *Pachter* also holds that (i) extrinsic evidence of the parties' understanding; and (ii) evidence as to whether the employee "acquiesced" in employer's practice for judging an employee's commissions earned, can determine when the compensation is "earned."

---

[4]    Under the NYLL, employers may not deduct from a "wage" unless it is permitted by law or authorized by the employee for "insurance premiums, pension or health and welfare benefits, contributions to charitable organizations, payments for United States bonds, payments for dues or assessments to a labor organization, and similar payments for the benefit of the employee." NYLL §§ 190(1), 193(1)(a), and (b).

Here, the applicable written commission plan unambiguously states that commissions will be reduced by the value of returned merchandise. (Christ Decl. ¶ 16). The commission plan is not only lawful, but fair: under it, neither Saks nor its sales associates profit from returned merchandise. Under *Pachter* and under Plaintiffs' theory of class certification, Saks associates cannot be members of the putative class **unless** Saks and they specifically agreed, on an associate-by-associate basis, that commissions were "earned" at some time **prior to** reductions based on returned merchandise. Given that the written commission plan states otherwise, such a finding would depend, under *Pachter*, on inherently individualized proof concerning each Plaintiff and every putative class member's individual understanding of: (i) what the commission plan says; and (ii) his or her own agreement with Saks. Moreover, the SAC implicitly concedes that, for years, the named Plaintiffs acquiesced in Saks' practice of reducing their commissions by the value of returns – a concession that stands at odds with allegations elsewhere in the SAC that the named Plaintiffs had a different understanding as to how they should have been paid. *See Pachter*, 10 N.Y. 3d at 618.

The declarations already obtained by Saks underscore the deeply individualized nature of the proof in this case. Sales associates were presented with, understood, and agreed to, the terms of the commission plan at the time they were hired. (Bleibdrey Decl. ¶¶ 7, 9-11; Mayon Decl. ¶¶ 6, 8-10; Lebron Decl. ¶¶ 8, 10-12; McCall Decl. ¶¶ 6, 8-10; Speer Decl. ¶¶ 6, 9-10; Cantone Decl. ¶¶ 8, 10-11, 13; Seltzer Decl. ¶¶ 7, 9-11; Khan Decl. ¶¶ 7, 9). Of course, these declarants cannot speak for the several hundred sales associates (by Plaintiffs' count) who form the putative class, nor can they speak for Plaintiffs themselves – **and that is exactly the point.** Plaintiffs simply cannot demonstrate by way of generalized proof the particular understanding or acquiescence of all putative class members. Indeed, the declarations gathered to date make clear

that at least some sales associates did acquiesce to the timing of the deductions in question. In

sum, because each sales associate will have had different experiences and different

understandings of their pay structure, the fate of each proposed class member ***cannot*** rise and fall

with the fates of Plaintiffs. Further, determination of the class itself would unavoidably require

individualized inquiries that are the hallmark of an inappropriate "fail-safe" class.

> **b.** ***The Need For Individualized Proof To Establish Claims and Defenses In This Action Precludes Class Certification.***
>
> > **i.** **Courts can, and routinely do, strike class allegations when Plaintiffs cannot satisfy the typicality, commonality, and predominance prerequisites of Rule 23.**

When the requirements of Rule 23 cannot be satisfied, a court need not wait to strike

"that part of the complaint that seeks to assert an action on behalf of a class" but can do so at the

pleading stage. *Tongo v. Derwinski*, No. 90-cv-4986, 1991 WL 243421, at *3 (S.D.N.Y. Nov. 14,

1991). *See also, e.g. Connolly v. McCall*, 254 F.3d 36, 42 (2d Cir. 2001) (affirming dismissal of

class claim on the pleadings prior to discovery); *Debose v. FedEx Corp.*, No. 08-cv-07042, 2009

WL 1542572, *5 (S.D.N.Y. June 2, 2009) (striking class allegations where plaintiff's claims

were "highly individualized"); *Fedotov v. Peter T. Roach and Assocs., P.C.*, 354 F. Supp. 2d

471, 478 (S.D.N.Y. 2005) ("preemptive" motion to strike class was properly before the court);

*Thompson v. Merck & Co.*, No. 01-cv-1004, 2004 WL 62710, at *2 (E.D.Pa. Jan. 6, 2004)

(denying class certification, and noting that no amount of additional discovery would alter the

conclusion that plaintiffs could not satisfy Rule 23; rather, additional discovery would likely

"illuminate the subjective and intangible differences of each class member's individual

circumstances"); *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) (affirming dismissal

of class allegations prior to class discovery where each class member's claim would require

individual proof); *Baum v. Great W. Cities, Inc. of N.M.*, 703 F.2d 1197, 1210 (10th Cir. 1983)

(affirming dismissal of class allegations and denial of class discovery because there were

substantial doubts as to whether plaintiffs could satisfy the predominance requirement even after

exhaustive discovery on the class action issue).

Put simply, the individualized proof required for Plaintiffs' Section 193 claims (*see*

Section II.C.2-4 at pp. 6-8, *supra*) cannot resolve the claims of absent class members.

Accordingly, this Court should rule now that Plaintiffs' Section 193 claims are unsuitable for

class treatment.

### ii. Plaintiff cannot meet the commonality, typicality, and predominance requirements of Rule 23.

In determining whether class treatment is appropriate, the Court must consider whether

the asserted claim could be tried to judgment within the framework of Rule 23. To that end, the

Court must probe beyond the surface of Plaintiffs' allegations to assess whether their claims

satisfy Rule 23's requirements. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982) (class

"may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites

of Rule 23(a) have been satisfied."). *See also In re Initial Public Offering Sec. Litig.*, 471 F.3d 24

(2d Cir. 2006). To proceed on a class basis, Plaintiffs must establish a properly defined class that

satisfies all of the requirements of Rule 23(a) – numerosity, commonality, typicality, and

adequacy of representation – and at least one of the provisions of Rule 23(b). *Denney v.*

*Deutsche Bank AG*, 443 F.3d 253, 267 (2d Cir. 2006). Plaintiffs' inability to meet these

requirements are strikingly apparent when considering the proofs they must submit under

*Pachter*.

### (1) There is no Commonality.

Commonality "requires that the disputed issue of law or fact occupy essentially the same

degree of centrality to the named plaintiff's claim as to that of other members of the proposed

class." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999). As described

by the Supreme Court, the relevant issue for class certification is not the "common questions"

but the ability of the class to "generate common answers." *Wal–Mart Stores, Inc. v. Dukes*, —

U.S. ——, 131 S.Ct. 2541, 2551 (2011). Here, because of the circumstances surrounding each

and every individual class member, none of Plaintiffs' claimed common questions have any hope

of generating common answers.

   As noted above, Saks' written compensation plan states that sales associates'

commissions are reduced when merchandise is returned by a customer. To overcome this express

language of the plan, Plaintiffs will have to show that the agreement is ambiguous as to when

commissions are "earned," and that there was some implied agreement that commissions were

"earned" at some time before merchandise is returned. Even assuming, hypothetically, that

**Plaintiffs** could show that each of them reached an implied understanding with Saks that their

commissions were "earned" some time before merchandise is returned, that showing would have

no bearing whatsoever on whether ***any other proposed class member*** reached the same implied

understanding. Indeed, the parties would be left to engage in hundreds of mini-litigations to

determine whether each putative class member agreed to, and/or, acquiesced in Saks'

compensation practices. And, given that hundreds of associates appear to have acquiesced to

those practices for years, Plaintiffs would then have to examine each such person's subjective

intent – and all this before we could ever begin to understand who is in the class in the first

place. Indeed, by the time such detailed evidence about class membership was gathered, there

would be no need for class litigation, since liability would be all but conclusively determined at

the class certification stage.

It is settled that where, like here, there is a clear inability to establish the claims of all

class members without resorting to individual proof, commonality does not exist. *See Vega v. T-*

*Mobile USA, Inc.*, 564 F.3d 1256, 1260-61 (11th Cir. 2009); *In re Starbucks Employee Gratuity*

*Litig.*, 264 F.R.D. 67, 75 (S.D.N.Y. 2009) (denying class certification of New York Labor Law

claims, finding that plaintiffs failed to establish that individual factual questions would not

predominate over common questions among the class). The Eleventh Circuit's decision in *Vega*

is particularly instructive as to how the issue of the implied understanding of compensation terms

requires individualized evidence and precludes class treatment. The Court in *Vega* reversed the

lower court's certification of claims for unpaid wages due to chargebacks against commission

advances. The court held that the class failed to meet Rule 23's commonality and predominance

requirements because the court would be forced to engage in an individualized inquiry into:

> what the employee was told (and agreed to) with respect to
> compensation rules and procedures at the time of hiring, the
> employee's subjective understanding of how he would be
> compensated and the circumstances under which his compensation
> might be subject to charge backs, and when and how any pertinent
> part of the employee's compensation agreement or understanding
> thereof may have changed during the course of that employee's
> tenure at T-Mobile.  *Id.* at 1272.

In addition to the individualized issue of what each employee was told, agreed to, and

subjectively understood with regard to when their compensation was "earned," the commissions

of Plaintiffs and putative class members are reduced by returns under highly variable and

individualized circumstances. For instance, whether the merchandise that a sales associate sold

would be subject to a return depends on how a customer pays, whether Saks can identify the sale

of returned merchandise, whether a sales associate who processes a return made a mistake, and

whether the sales associate who sold the merchandise checked the records of what merchandise

was returned. (*see* Section II.C.2-4 at pp. 6-8, *supra*). Moreover, sales directors have

14

individualized discretion to allow an associate to retain a commission notwithstanding the return, or adjust a commission where it may not be warranted – for example, in situations where a sales is not recorded correctly, or when a commission should just be "shared" because it is fair, in their judgment, to do so. (*See Id.*). Plaintiffs will have to account for all of these circumstances in order to prove Saks' liability to any particular associate. Indeed, for precisely those reasons, the *Vega* court held that "[t]he uncommon and individualized nature of [these] critical inquir[ies], and [their] foundational importance to the liability determination for each class member, render[ed] class certification inappropriate." *Id.* at 1275. Those exact same concerns exist in this case and preclude class certification.

### (2)    *There is no Typicality.*

Typicality "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993). Typicality involves an inquiry into "the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims." *Indergit v. Rite Aid Corp.*, 293 F.R.D. 632, 652 (S.D.N.Y. 2013) (citations omitted). A complaint must do more than facially assert the same legal theories on behalf of all putative class members. Otherwise, every putative class action complaint that included "class action allegations" and pleaded claims on behalf of a class would, on that basis alone, meet the requirement of "typicality."

Here, given the need for highly individualized *Pachter*-type proof to establish Plaintiffs' claim, the evidence of Plaintiffs' understanding of, and their reasons for acquiescing in, Saks' compensation system will not advance the claims of other class members. Therefore, typicality is lacking and class treatment is inappropriate. *See In re Fosamax Prods. Liability Litig.*, 248 F.R.D. 389, 399 (S.D.N.Y. 2008) (denying class certification because each class member "must

offer highly individualized proof to establish most elements" of his or her claim such that the claims of the named plaintiffs are not typical of the putative class members' claims); *Stott v. Haworth*, 916 F.2d 134, 143 (4th Cir. 1990) (if a court must make specific, individual inquiries as to each of the class plaintiffs regarding critical issues, then there is no commonality and typicality, and certification is improper); *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 469 (N.D. Ill. 2009) (denying certification where representative's claims were not typical of class members, and observing that individual inquiries precluded finding typicality).

### (3) *There is no Predominance.*

Given that the highly individualized nature of Plaintiffs' Section 193 claims foreclose a finding of commonality or typicality under Rule 23(a), *a fortiori*, Plaintiffs cannot establish that common questions predominate under Rule 23(b)(3). *See Gaston v. Exelon Corp.*, 247 F.R.D. 75, 88 (E.D. Pa. 2007) (a "finding that plaintiffs have failed to meet the commonality requirement [of Rule 23(a)(2)] is, by itself, dispositive of the Rule 23(b)(3) question."). Indeed, predominance is "a more demanding criterion than the commonality inquiry under Rule 23(a)." *Lizondro–Garcia v. Kefi LLC*, 300 F.R.D. 169, 176–177 (S.D.N.Y. 2014). It is only met if the more substantial aspects of the litigation will be susceptible to proof for all class members. *Myers v. Hertz Corp.*, 624 F.3d 537, 551 (2d Cir. 2010). Moreover, the efficiency of class litigation is achieved only if "generalized" proof applies to the ***whole*** class. *Id.* at 549. As noted above, there can be no "generalized" proof in this case.

Even before evaluating whether Plaintiffs can satisfy their burden that common questions predominate, the court must determine what the common questions are in the first place. A "common question" is not simply a question that can be framed for all in a single sentence; it is a question that can be ***answered*** for all based on the ***same*** evidence. *See, e.g., Wal–Mart Stores, Inc. v. Dukes*, ––– U.S. ––––, 131 S.Ct. 2541, 2551 (2011) ("[w]hat matters to class certification

is . . . the capacity of a classwide proceeding to generate common answers" and "[d]issimilarities within the proposed class are what have the potential to impeded the generation of common answers.") (internal quotations omitted).

Plaintiff's alleged "common questions" are:

- Whether Defendant unlawfully failed to fully pay appropriate compensation to members of the Proposed Class in violation of minimum wage laws;

- Whether Defendant failed to keep accurate time records for all hours worked by the Plaintiffs and the Proposed Class, in violation of the FLSA, 29 U.S.C. §201 *et seq.*, and state wage laws;

- Whether Defendant made improper deductions in violation of the NYLL;

- Whether Defendant provided accurate itemized wage statements to the Plaintiffs and the New York Class pursuant to state wage laws;

- The proper measure of damages sustained by the Proposed Class; and

- Whether Defendant's actions were "willful."

(SAC, ¶ 47(A)-(F)). None of these questions are "common" under Rule 23: they all depend upon individualized threshold questions concerning the implied understanding of the parties about what constituted "earned" wages. Answers to these "common questions" regarding "appropriate compensation," "improper deductions," "accurate" time records and wage statements, and "proper measure of damages," all turn on such individualized inquiry and, as such, class certification would serve no beneficial purpose. It is black letter law that predominance is lacking where, as here, individualized issues of fact abound. *See, e.g., Edwards v. Publishers Circulation Fulfillment, Inc.*, No. 09-cv-4968, 2010 WL 2428083, at *2 (S.D.N.Y. June 17, 2002) (plaintiffs "failed to provide any indication that the employment status of the putative class members could be proved by common evidence"); *In re Starbucks*, 264 F.R.D. at 75 (individual factual questions predominated over common questions concerning plaintiffs' New York Labor

Law claims); *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255-56 (2d Cir. 2002) (affirming denial of class certification because defendant's liability for fraud required individualized proof); *Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 226 F.R.D. 446, 451 (S.D.N.Y. 2005) (finding that typicality and predominance requirements were not meet where individual proof was necessary to establish plaintiffs' claims).

> **2.    Plaintiffs' "Minimum Wage" Claim Requires Individualized Proof and Cannot Satisfy the Commonality, Typicality, and Predominance Requirements Either.**

Plaintiffs also bring an NYLL claim for failure to pay "minimum wage." This claim is more properly characterized as an "off the clock" claim under the NYLL. Specifically, Plaintiffs allege that they were required to attend meetings, fashion shows, and perform other work while not clocked in, and were not paid at least the minimum wage for time spent doing such activities. In the same way as Plaintiffs' Section 193 claim, their minimum wage claim under the NYLL requires individualized proof and is not appropriate for class treatment as a matter of law.

The evidence Saks has obtained shows that Plaintiffs necessarily will have to present individualized evidence regarding each Plaintiff and each putative class member's personal practices with regard to attendance at vendor shows, meetings, and other alleged "work." These Declarations show the individualized nature of such evidence:

- Sales associates clock in and out on time, and have not been pressured or incentivized to work while not clocked in. (Bleibdrey Decl. ¶¶ 20-22; Brunelle Decl. ¶ 32; Cantone Decl. ¶¶ 25-28; Fulmer Decl. ¶ 6; Gignac Decl. ¶¶ 18-21; Khan Decl. ¶¶ 17-20; LeBron Decl. ¶¶ 19-22; Mayon Decl. ¶¶ 19-22; McCall Decl. ¶¶ 21-25; Niang Decl. ¶¶ 22, 24; Seltzer Decl. ¶¶ 21-24; Speer Decl. ¶¶ 19-22; Whitaker Decl. ¶ 20).

- Sales associates are clocked in when attending vendor shows that are held during work hours. (Bleibdrey Decl. ¶ 23; Brunelle Decl. ¶ 12; Fullmer Decl. ¶ 6; Gignac Decl. ¶ 21; Khan Decl. ¶ 22; LeBron Decl. ¶ 23; Mayon Decl. ¶¶ 24-25; McCall Decl. ¶¶ 26-28; Niang Decl. ¶¶ 25-27; Seltzer Decl. ¶ 25; Speer Decl. ¶ 23; Whitaker Decl. ¶¶ 16-18).

- Attending fashion shows that are held off the clock, or after-hours, are voluntary, and any decision to attend them are made by each sales associate individually and done on their own time and for their own benefit. (Bleibdrey Decl. ¶ 25; Brunelle Decl. ¶¶ 13, 16; Cantone Decl. ¶¶ 29-30; Fulmer Decl. ¶ 8).

- Sales associates who contact clients on non-work time do so of their own choosing, and without the knowledge of supervisors who, if they knew, would not condone it. (Brunelle Decl. ¶ 32; Whitaker Decl. ¶ 19).

- If a sales associate does conduct work off-the-clock, it is for a small amount of time, specifically in situations when a customer approaches them right after the sales associate clocks out or right before the sales associate clocks in. (Khan Decl. ¶ 20; Niang Decl. ¶ 23).

These declarants alone make clear that there is no class-wide, common policy under which Saks requires associates to work off the clock. Rather, to determine class membership, the court would have to examine the conduct, practices, and individual experiences of each and every Plaintiff and putative class member.

Accordingly, the SAC does not meet the commonality, typicality, and predominance requirements of Rule 23. Commonality cannot be met as Plaintiffs are simply unable to establish the claims of all class members without resorting to individualized proof to, not only show they worked off the clock, but also to rebut the testimony of other sales associates, perhaps hundreds of them, who state the opposite. Typicality cannot be met because each class member's claim arises, not from the "same course of events," *Robidoux*, 987 F.2d at 936, but from one-off occurrences that by definition vary from person to person. And finally, predominance cannot be met because, far from a substantial aspect of the litigation being susceptible to generalized proof for all class members, there is no generalized proof whatsoever. *Myers*, 624 F.3d at 551.

**B.     Plaintiffs are Not Entitled to Conditional Certification of a Collective Action Under the FLSA.**

Plaintiffs also bring an "off the clock" collective action claim under the FLSA. This

claim is equally inappropriate in light of the individualized issues that must be analyzed to resolve the merits of each putative class member's claims.

The threshold issue for certification in an FLSA collective action is whether the plaintiff has demonstrated that potential class members are "similarly situated." 29 U.S.C. § 216(b); *Patton v. Thompson Corp.*, 364 F. Supp. 2d 263, 266 (E.D.N.Y. 2005). As acknowledged by the Second Circuit, "district courts … appear to have coalesced around a two-step method" to determine whether class notice should be issued at an early stage of the proceeding (the so-called "notice" stage), and then re-visiting the issue later to re-certify or de-certify the class. *Myers*, 624 F.3d at 555. Nevertheless, conditional certification is far from automatic, as it is plaintiff's burden to justify it. *D'Anna v. M/A-Com, Inc.*, 903 F. Supp. 889, 893-94 (D. Md. 1995).

Here, Plaintiffs cannot meet even the more lenient standard of the first tier of the two-tier approach. During the first tier "notice" stage, Plaintiffs cannot simply assert "conclusory allegations" of a widespread policy or practice, *H&R Block v. Housden*, 186 F.R.D. 399, 400 (E.D. Tex. 1999), but rather must show that they and the proposed class members "together were victims of a common policy or plan that violated the law." *Doucoure v. Matlyn Food, Inc.*, 554 F. Supp. 2d 369, 372 (E.D.N.Y. 2008); *see also Lynch v. United Servs. Auto Ass'n*, 491 F. Supp. 2d 357, 368 (S.D.N.Y. 2007). Additionally, there must be "some identifiable factual nexus which binds the named plaintiffs and the potential class members together…." *Palmer v. Readers Digest Ass'n*, No. 84-cv-8397, 1986 WL 11458, at *1 (S.D.N.Y. Oct. 3, 1986); *see also Prizmic v. Armour, Inc.*, No. 05-cv-2503, 2006 WL 1662614, at *2 (E.D.N.Y. June 12, 2006) (Plaintiff must "provide actual evidence of a factual nexus between his situation and those that he claims are similarly situated rather than mere conclusory allegations.").

As with the Court's Rule 23 analysis, the guiding principle behind conditional

certification is judicial efficiency. *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Specifically, even "at the initial stage of the certification inquiry … neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if [the court] were to overlook facts which generally suggest that a collective action is improper." *West v. Border Foods, Inc.*, No. 05-cv-2325, 2006 WL 1892527, at *7 (D. Minn. July 10, 2006). If there is an off-the-clock claim under the FLSA here, it stems from the individual conduct of each sales associate and each associate's manager, not the result of an unlawful policy. Indeed, Saks' declarations cited above are evidence that Saks did not require working off the clock, that associates could chose not to attend vendor and fashion shows, and that when associates did attend, they were instructed to clock in. Further, these questions all require an individual inquiry and, accordingly, resolution of the certification issue is directly at odds with judicial efficiency. *Roebuck v. Hudson Valley Farms, Inc.*, 239 F. Supp. 2d 234, 238 (N.D.N.Y. 2002).

### 1. Plaintiffs Are Not Similarly Situated to the Putative Collective Action Members Because They Fail to Demonstrate the Existence of a Common Unlawful Policy or Practice.

As a threshold matter, Plaintiffs must show that they, and the putative collective action members, were together victims of a uniform and unlawful decision, policy, or plan. *Prizmic*, 2006 WL 1662614, at *2. "Absent such a showing, an employer may be 'unduly burdened' by a frivolous fishing expedition conducted by plaintiff at the employer's expense." *Id.* Courts routinely deny collective action treatment where there is no common employer policy or plan at the root of an alleged injury. *See, e.g., Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828, 1996 U.S. Dist. LEXIS 22564, at *10-12 (D. Minn. Mar. 18, 1996); *D'Anna*, 903 F. Supp. at 894; *Ulvin v. Northwestern Nat'l Life*, No. 3-88-730, 1991 U.S. Dist. LEXIS 17842, at *3-4 (D. Minn. Aug. 8, 1991). Here, Plaintiffs do not allege a single decision, policy or plan that violates any law – indeed, there is none – and the alleged class members cannot be similarly situated. *See*

21

*TGF Precision Haircutters*, 2005 WL 1994286, at *4 ( "evidence of varied particular violations is insufficient to show that [d]efendants implemented a uniform, systematically applied policy of wrongfully denying overtime pay to [p]laintiffs"). Whether or not there were violations of the FLSA, there is no common *policy* at issue here.

        **a.**      ***Adjudication of Plaintiffs' Claims Necessarily Requires Individualized Inquiries That Are Inappropriate for Collective Action Treatment.***

Notwithstanding a lower standard of review at the first "notice stage" of the FLSA certification process, district courts have recognized that conditional certification should be denied when individualized issues and defenses will eventually need to be analyzed. *Pelczynski v. Orange Lake Country Club, Inc.*, 284 F.R.D. 364, 369 (D.S.C. 2012) ("the [c]ourt finds – even at this notice stage – that certification of the collective action would be inappropriate . . . . Particularly, the [c]ourt is convinced that it must eventually conduct an individualized assessment of each of [p]laintiff's claims…"); *Clay v. Huntington Ingalls, Inc.*, No: 09-cv-7625, 2011 U.S. Dist. LEXIS 155351,*16 (E.D. La. Sept. 29, 2011) ("the [c]ourt does not agree with [p]laintiff's contention that the [c]ourt should simply ignore the fact that certain individualized defenses might apply and postpone the issue until decertification"); *Wallace v. Norcross Assocs., LLC*, No 13-cv-1349, 2014 WL 1373659, at *3 (N.D. Ga. Apr. 8, 2014) (denying motion for conditional certification because "any resolution of [p]laintiff's claims would require a highly individualized analysis not suited for collective action"). In *Pelczynski*, the court denied conditional certification of a class of commission employees because it concluded "that it must eventually conduct an individualized assessment of each of [p]laintiff's claims." *Pelczynski*, 284 F.R.D. at 369, n.7 (denying certification where case would "require a week-by-week and [p]laintiff-by-[p]laintiff calculation"). Far from the "week-by-week" analysis that *Pelcynski* found inappropriate for class treatment, the analysis of Plaintiffs' off-the-clock claims will

require a minute-by-minute assessment of whether each purported class member did, in fact, work off the clock, and for how long.

An individualized examination is also necessary to determine liability, if any, and the amount of wages owed due to a variety of defenses raised to Plaintiffs' claims. In particular, the potential defenses to any alleged FLSA overtime violations will require highly individualized evidence concerning each sales associate. For example, Saks is entitled to demonstrate: (1) that any alleged off-the-clock work did not occur or show that it did not result in nonpayment wages; (2) that its managers and supervisors did not know about the purportedly uncompensated work;[5] (3) that any purportedly uncompensated work falls within the *de minimis* exception to the FLSA;[6] (4) that Plaintiffs' claims are barred, at least in part, by § 4 of the Portal to Portal Act, 29 U.S.C. § 254, as to all hours during which Plaintiffs were engaged in activities that were preliminary or post-liminary to their principal activities; (5) that sales associates' claims are barred by statutes of limitations or technical defaults; and (6) that Defendant acted in good faith and that liquidated damages are not appropriate. To be sure, Saks has a policy in its handbook that improper deductions are not allowed, (Christ Decl. ¶ 44), and the commission plan states

---

[5]  Saks' handbook clearly notifies its employees of a reporting obligation regarding improper deductions and that they are also "required to report on" all of their time worked. (Christ Decl. ¶¶ 44, 47, 49). This evidence relates directly to the defense that Saks did not have knowledge of any alleged improper deductions, or alleged off-the-clock work. The Second Circuit has unequivocally held that if an employer does not know or have reason to know that an employee has performed work, the employer cannot be liable for the failure to pay the employee. *Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998). Whether Defendant "suffered or permitted" employees to work during lunch breaks or in excess of forty hours per week requires an analysis of whether "the employer 'knows or has reason to believe that [the particular employee at issue] is continuing to work.'" *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 718 (2d Cir. 2001). Such an inquiry would also be required of each and every Plaintiff and putative class member.

[6]  *See Reich v. New York City Transit Auth.*, 45 F.3d 646, 650 (2d Cir. 1995) (confirming that where the compensable preliminary work is truly minimal, it is the policy of the law to disregard it). There are at least two declarations that suggest such an issue will be highly litigated in this case as there is evidence that some of the alleged "off-the-clock" work occurred in very minimal amounts immediately after, or before, a sales associate was clocking in or out. (Khan Decl. ¶ 20; Niang Decl. ¶ 23).

23

that Saks will comply will all laws applicable to retail business. (Christ Decl. ¶ 15). The availability of the above defenses and individualized issues in a proposed collective action of this nature presents "enormous manageability problems" and warrants denial of class certification under the FLSA. *Basco v. Wal-Mart Stores, Inc.*, No. 00-cv-3184, 2004 WL 1497709, at *8 (E.D. La. July 2, 2004) (denying FLSA class certification while noting that the above defenses to a claim of alleged FLSA violations "*will* require highly individualized evidence concerning each associate") (emphasis added).

Plaintiffs are highly compensated commission sales associates who, as explained above, have earned well over the minimum wage during their employment at Saks. Indeed, they have all earned at most $49.31 per hour, (Christ Decl. ¶ 41), and at least $17.25 per hour, (Christ Decl. ¶ 43). This is relevant because courts will only find a minimum wage violation under the FLSA if an employee's aggregate wages for a given week divided by the total number of hours actually worked during that week (including off-the-clock time), yields an hourly wage below the statutory minimum. *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960) (provided that a total weekly wage exceeds minimum wage for all hours worked, there has been no FLSA minimum wage violation); *Perez v. Westchester Foreign Autos, Inc.*, No. 11-cv-6091, 2013 U.S. Dist. LEXIS 35808, at *31 (S.D.N.Y. Feb. 28, 2013) (holding that "the [FLSA] requires that each employee receive, each week, an amount equal to the minimum wage times the number of hours worked."); *Monahan v. County of Chesterfield*, 93 F.3d 1263, 1270 (4th Cir. 1996) (Employees "have been properly compensated under the FLSA when, for any work period during which they have performed less than the applicable maximum hours standard, they have received at least the minimum wage . . . for all hours worked.") (*quoting* October 22, 1987 United States Department of Labor Wage & Hour Division Opinion Letter). This data

underscores the fact that there will be yet another individualized analysis required of the Court to determine whether violations of the FLSA were committed here. Not only will each individual's conduct need to be analyzed to determine the amount of alleged off-the-clock time worked, but a separate analysis will be required to determine whether the total amount of time "worked" (including off-the-clock time) divided by the amount of wages each individual was actually paid, equals a rate of pay lower than the applicable minimum wage. This analysis would apply to the hundreds (perhaps thousands) of individuals in the putative class. Because of this, it is plain that collective adjudication of Plaintiffs' claims would not promote judicial efficiency because several levels of individualized evidence, and analysis thereof, would be necessary to decide the merits of any given sales associate's claims.

## IV.    CONCLUSION

For the foregoing reasons, Defendant respectfully requests that Plaintiffs' Motion to Strike the Class Allegation be granted.

Dated:  New York, New York  
       October 15, 2015

**KELLEY DRYE & WARREN LLP**

By: _____*s/John P.J. Mattiace*_____  
    Mark A. Konkel  
    Robert I. Steiner  
    John P.J. Mattiace  

    101 Park Avenue  
    New York, New York 10178  
    rsteiner@kelleydrye.com  
    mkonkel@kelleydrye.com  
    jmattiace@kelleydrye.com  
    (212) 808-7800  
    (212) 808-7897 (Facsimile)  

    *Attorneys for Defendant*