# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMRA DIVLJANOVIC, RAMSES CARRANZA, MARK ASKEW, NORA LAJQI, FAYE TAGHAVI, RINA TOLEDANO, MARVIN K. BLAKES, and JUANITA V. PARKS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SAKS & COMPANY d/b/a SAKS FIFTH AVENUE<br><br>Defendant. | Case No. 2014-cv-7533<br><br>**DECLARATION OF THEO CHRIST** |

**Theo Christ**, declares, pursuant to 28 U.S.C. § 1746, that:

1.  I am the Vice President of Human Resources for Saks Fifth Avenue located at 611 Fifth Avenue, New York, New York 10022 ("Saks"). My duties and responsibilities include managing all aspects of human resources and staff-oriented issues concerning the store's employees, including all sales associates.

2.  I submit this declaration in support of Saks' Motion to Strike the Class Allegations. I have personal knowledge of the matters set forth herein.

**Saks' Operations Generally**

3.  Saks' New York City store consists of a number of separate selling departments corresponding to the type of apparel being sold on the selling floor of the store.

4.  Each selling department is headed by a Director under whom there are several sales associates. The sales associates are the primary customer contacts on the sales floor.

**Saks' Written Commission Plan Generally**.

5. Sales associates are compensated according to the terms of a written commission plan.

6. The written commission plan is presented to each new sales associate hire, and a representative of Saks explains the commission plan to each new hire.

7. Prior to 2015, the written commission plan was also redistributed each year to each sales associate at Saks who is required to acknowledge their receipt of the plan.

8. There are several written commission plans that apply to sales associates at Saks, but the plan under which most sales associates fall is called the "Commission Compensation Plan Document – Draw Associate" ("Draw vs. Commission Plan"). A true and correct copy of the most recent Draw vs. Commission Plan in effect for Saks sales associates from 2014 is attached hereto as Exhibit A.[1]

9. Under the 2014 Draw vs. Commission Plan, a sales associate will receive a "draw" rate which is defined as an hourly rate "that is an advance against future commissions." *Id.* Every hour that an associate is working on the selling floor (called "productive time"), the associate is earning a draw rate. *Id.*

10. Each product at Saks carries with it a different commission percentage. In addition to his or her draw rate, each sales associate receives the commission percentage associated with each product the sales associate sells.

**Overtime, Returns, and Arrears Under Saks' Commission Plan**.

---

[1] The commission plans from 2010 through 2014 have not changed materially in any aspect relevant to this case. All matters discussed and cited to in this Declaration have been the same in the written Draw vs. Commission plan since 2010. A true and correct copies of all the Draw vs. Commission plans within the limitations period (from 2008) are attached hereto as Exhibit K.

2

11. If the commissions the sales associate earns do not exceed the draw amount the sales associate earns, the sales associate will fall into "arrears." *Id.* The amount a sales associate falls into arrears will be deducted from their future commissions. *Id.* Put another way, future commissions will be reduced by the amount of arrears. *Id.* Because of that, sales associates' pay for any given week cannot be determined or calculated until arrears are taken into account during a subsequent week. Saks has never required a departing employee to "pay back" any amount of arrears that has accrued.

12. Commission payments are paid weekly, and are not capped. *Id.* Accordingly, there is no maximum amount that a sales associate can earn. *Id.* On the other hand, sales associates "will not receive less than their current draw for each productive hour worked during a pay period." *Id.*

13. Saks also pays overtime for time a sales associate works over 40 hours a week and this policy is incorporated into Saks' employee handbook. A true and correct copy of the Saks employee handbook is attached hereto as Exhibit B.

14. Saks' handbook provides that if any associate's earnings include commission, the associate is "not eligible for overtime if [the associate's] regular rate of pay is more than one and one-half times the prevailing Federal Minimum Wage, and more than half of [the associate's] commission for a representative period (not less than one month) represents earnings from commission." *See* Exhibit B, p 27. Saks pays all sales associates consistent with this policy.

15. The Draw vs. Commission plan expressly states that Saks "will comply with federal and state laws applicable to retail businesses." *See* Exhibit A.

16. When an item of merchandise is returned, and the sales associate who actually sold that item is identified, the Draw vs. Commission plan provides that "commission for the sales will be deducted from that associate's earning at the same rate it was originally paid." *Id.*

17. The Draw vs. Commission plan contains specific examples that show what amounts the sales associates will earn, depending on the amount of sales they make, and what draw they receive. *Id*.

18. Under the plan, draw rates can fluctuate. *Id.* For example, they may be adjusted each month depending upon the amount of arrears that an associate has. *Id*. Specifically, the Draw vs. Commission plan establishes a "Maximum Draw Rate." *Id.* If a sales associate's draw is more than the Maximum Draw Rate, and their arrears exceed the maximum amount allowed under the plan, the associate's draw will be reduced in increments every 30 days until the draw reaches the Maximum Draw Rate. *Id*.

19. Sales associates are paid every Friday for hours worked in the previous week running Sunday through Saturday. *Id.*

20. Saks expects and frequently encourages commission sales associates to use their selling skills to cross-sell products in other departments. Sales associates frequently cross-sell products in other departments. This benefits both Saks and the commission sales associates making the sales because the associates are able to earn more commission on the sale of some higher priced products, or on products that have a higher commission percentage associated with them.

NY01\MATTJ\4224415.2

21. For each item of merchandise that is returned, Saks identifies the commission sales associate who processed the original purchase before the return reduces the sales associate's commission.

22. Each sale transaction at Saks is issued a transaction number which is linked to an amount of commission and the associate who received such commission.

23. If the returning customer has a receipt, the transaction number on that receipt is cross-referenced to the associate when the associate enters the information on the receipt in to the computer system. The computer automatically identifies the appropriate sales associate because the transaction number is associated with the associate who made the sale.

24. If no receipt is presented, the next step is to look up the transaction by some other method. The most common is by credit card. In these situations, the credit card number that was used can be looked up in the system and cross referenced to the sale containing the merchandise being returned.

25. If there is no credit card associated with the transaction, the customer's name and address is referenced to see whether Saks has a profile stored for that customer and any transactions that may be associated with it.

26. If the name and address information is not found, then Saks' Client Services department could be called to take further steps to identify the transaction and, if possible, find the associate who made the sale.

27. If there is no identifying information – which occurs when a customer does not to provide any identifying information to Saks and does not have a profile – there is no way to identify the transaction or the sales associate who made the sale. In these situations, the return is processed as a merchandise credit to the customer for the item's lowest selling price.

NY01\MATTJ\4224415.2

28. Saks does not deduct returns from any sales associate's commission when a sales associate cannot be linked to the original sale. If the sales associate cannot be identified, then it is impossible for the return to affect any sales associate.

**Discretionary Adjustments to Commissions May Be Done But Saks Must Know Of Them**.

29. Saks Sales Directors have complete discretion on returned merchandise to make what is called a "productivity adjustment" to the commissions of Saks' commission sales associates. Typically, when merchandise that a commission sales associate sells is returned by a customer, the amount of commission awarded on that sale is deducted from the sales associate's next draw. However, a Director can make a decision whether to make a "productivity adjustment" and waive the deduction to commission when, in the Director's judgment, the customer's return should not be attributable to a sales associate.

30. One example of a productivity adjustment is when the product being returned has a defect. In those situations, Saks' policy is to fix the defect, replace the defective product with another, or give the customer a store credit. Sometimes, the customer will insist on receiving money back on the return. When this happens, it is within a Director's discretion to make productivity adjustments for the sales associate associated with the returned product.

31. Another example of a productivity adjustment is when a product is being altered in Saks' alteration department. When alterations are done in a way where the customer is not happy and returns the merchandise, it is within a Director's discretion to make a productivity adjustment for the sales associate associated with the returned product.

32. If Directors do not know about a situation where returned merchandise should not reduce commission by way of a productivity adjustment, then they cannot use their discretion to make a productivity adjustment. Sales associates are free to bring to the attention of

Directors any situation involving returned merchandise that they feel should be the subject of a productivity adjustment.  If sales associates do not bring up situations like returned alterations, or any other situation that they feel should reduce their commission, then a productivity adjustment cannot be made because the Director does not know about it.

**A Detailed Individualized Analysis of Plaintiffs' Earnings**.

33. Commissions are the primary way in which Saks sales associates earn their income, and accordingly, for most weeks during the year, more than fifty percent (50%) of Saks sales associates' income is made up of commission.

34. Although each Saks sales associate will earn commission that makes up more than fifty percent of his or her total compensation, there may be weeks in which there are more returns than usual, or in which there is a lull in selling.  In these weeks, the sales associate will never earn less than his or her draw rate.

35. A detailed analysis of Saks' payroll records shows that all of the Plaintiffs in this case have earned well above 1.5 times the minimum wage during their employment at Saks.  These figures were reached by doing an individual analysis of Plaintiffs' earnings – specifically by dividing each Plaintiffs' total annual compensation by the number of hours worked, exclusive of any overtime payments Saks paid to them.

36. Plaintiff Amra Divljanovic was a sales associate at Saks from about November 2004 until about June 2013.  Ms. Divljanovic's average annual earnings during the limitations period was $26.74 per hour.  A true and correct copy of Ms. Divljanovic's detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [C].  Specifically, Saks' records show she had the following earnings per year:

- $28.73 per hour in 2008;

7

- $29.39 per hour in 2009;
- $30.79 per hour in 2010;
- $31.16 per hour in 2011;
- $22.19 per hour in 2012; and
- $18.16 per hour in 2013.

*Id.*

37. Plaintiff Ramses Carranza was a sales associate at Saks from about September 2002 until about June 2012. Mr. Carranza's average annual earnings during the limitations period was $36.76 per hour. A true and correct copy of Mr. Carranza's detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [D]. Specifically, Saks' records show he had the following earnings per year:

- $42.49 per hour in 2008;
- $41.89 per hour in 2009;
- $40.53 per hour in 2010;
- $33.98 per hour in 2011; and
- $24.93 per hour in 2012.

*Id.*

38. Plaintiff Mark Askew was a sales associate at Saks from about March 2007 until about February 2010. Mr. Askew's average average annual earnings during the limitations period was $23.08 per hour. A true and correct copy of Mr. Askew's detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [E]. Specifically, Saks' records show he had the following earnings per year:

- $26.08 per hour in 2008;

8

- $19.94 per hour in 2009; and
- $23.22 per hour in 2010.

*Id.*

39. Plaintiff Nora Lajqi was a sales associate at Saks from about November 2009 until about September 2011. Ms. Lajqi's average annual earnings during the limitations period was $21.27 per hour. A true and correct copy of Ms. Lajqi's detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [F]. Specifically, Saks' records show she had the following earnings per year:

- $25.50 per hour in 2009;
- $20.12 per hour in 2010; and
- $18.20 per hour in 2011.

*Id.*

40. Plaintiff Faye Taghavi was a sales associate at Saks from about May 2007 until the present. Ms. Taghavi's average annual earnings during the limitations period was $34.11 per hour. A true and correct copy of Ms. Taghavi's detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [G]. Specifically, Saks' records show she had the following earnings per year:

- $35.06 per hour in 2008;
- $39.82 per hour in 2009;
- $47.01 per hour in 2010;
- $38.31 per hour in 2011;
- $30.78 per hour in 2012;
- $23.31 per hour in 2013; and

- $24.50 per hour in 2014 (this figure represents earnings through September 20, 2014, the date the Complaint was filed in this case).

*Id.*

41. Plaintiff Rina Toledano was a sales associate at Saks from about February 2007 until about March 2013.  Ms. Toledano's average annual earnings during the limitations period was $36.98 per hour.  A true and correct copy of Ms. Toledano's detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [H].  Specifically, Saks' records show she had the following earnings per year:

- $49.31 per hour in 2008;
- $40.46 per hour in 2009;
- $36.28 per hour in 2010;
- $38.03 per hour in 2011;
- $36.41 per hour in 2012; and
- $21.39 per hour in 2013.

*Id.*

42. Plaintiff Marvin K. Blakes was a sales associate at Saks from about June 1994 until about August 2012.  Mr. Blake's average annual earnings during the limitations period was $25.18 per hour.  A true and correct copy of Mr. Blake's detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [I].  Specifically, Saks' records show he had the following earnings per year:

- $28.14 per hour in 2008;
- $25.86 per hour in 2009;
- $26.50 per hour in 2010;

10

- $23.83 per hour in 2011; and
- $22.59 per hour in 2012.

*Id.*

    43.  Plaintiff Juanita Parks was a sales associate at Saks from about September 2006 until about October 2012. Ms. Parks' average annual earnings during the limitations period was $22.41 per hour. A true and correct copy of Ms. Parks' detailed weekly earnings each year within the limitations period are attached hereto as Exhibit [J]. Specifically, Saks' records show she had the following earnings per year:

- $26.38 per hour in 2008;
- $25.87 per hour in 2009;
- $21.77 per hour in 2010;
- $20.77 per hour in 2011; and
- $17.25 per hour in 2012.

*Id.*

**Associates Must Notify Saks Of Possible Improper Deductions, And Any Time Worked Outside Regularly Scheduled Hours**.

    44.  Regarding deductions, Saks' employee handbook provides that "the company does not allow deductions that violate the FLSA" and that the company "prohibit[s] all company managers from making any improper deductions . . . ." *See* Exhibit B, p. 28. Moreover, Saks' handbook states that, for associates who merely believe that an improper deduction has been made, the associate "should immediately report this information to your direct supervisor, or to an official in the Human Resources department." *Id.* Saks' policy is to ensure that "[r]eports of improper deductions will be promptly investigated" and "[i]f it is determined that an improper deduction has occurred, [the associate] will be promptly reimbursed

11

NY01\MATTJ\4224415.2

for any improper deduction made." *Id.*  Thus, each associate has an opportunity and responsibility under Saks' policy to report any instances where they believe improper deductions have been made.

46. Saks' policy is that sales associates are not supposed to work before or after their scheduled shifts or during their meal breaks.  Saks' policy requires sales associates who conduct sales activity outside of their scheduled work time to report any time spent on such activity to a manager so that their time is accurately recorded and they can be paid accordingly.

46. The employee handbook also emphatically states that associates "<u>are not required</u>, or otherwise under any obligation to work outside of their regularly scheduled hours and outside of the store." *See id.* at p. 39 (emphasis in original).

47. Saks understands, however, that, from time to time, customer contact with sales associates occurs outside scheduled work-time.  *Id.*  Accordingly, the employee handbook provides that associates are "required to report on and will be reimbursed for their time worked." *Id.*

48. Saks' policy is that associates report such time as hours worked and have all of these non-scheduled hours approved by their manager.  *Id.*  Any non-scheduled time that exceeds 2.5 hours weekly is to be monitored by the associate's manager and could be considered to be excessive if the associate crosses into overtime hours.  *Id.*

49. Saks' handbook states that "Associates are expected to monitor their time and advise their Manager in advance if they expect to surpass 2.5 hours of such time in any given week." *Id.*

50. The associate must be relieved of any non-scheduled work that is considered "excessive." *Id.*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13th day of October, 2015 in New York, New York.

_____
**THEO CHRIST**