UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMRA DIVLJANOVIC, RAMSES CARRANZA, MARK ASKEW, NORA LAJQI, FAYE TAGHAVI, RINA TOLEDANO, MARVIN K. BLAKES, and JUANITA V. PARKS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SAKS & COMPANY d/b/a SAKS FIFTH AVENUE<br><br>Defendant. | Case No. 2014-cv-7533 |

**DEFENDANT SAKS & COMPANY'S REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF ITS MOTION TO STRIKE THE CLASS ALLEGATIONS
IN PLAINTIFFS' SECOND AMENDED COMPLAINT**

KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800 (telephone)
(212) 808-7898 (facsimile)

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ..................................................................................... 1

II. ARGUMENT .................................................................................................................. 2

    A. Plaintiffs Ignore Case Law Requiring Individual Treatment of Their Claims ................................................................................................................. 2

        1. Plaintiffs Fundamentally Misread Saks' Commission Plan ..................... 2

        2. Saks' Commission Plan Requires an Individualized Analysis of Each Plaintiff and Putative Class Member's Understanding ................... 3

        3. Plaintiffs Ignore Case Law Requiring Individual Treatment of Their Claims ............................................................................................. 4

    B. Contradictions between Plaintiffs' Allegations and Saks' Declarants Demonstrate that Plaintiffs' Claims are Individualized at Their Core ................... 5

III. CONCLUSION ............................................................................................................. 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Pachter v. Bernard Hodes Group, Inc.*,
  10 N.Y.3d 609 (N.Y. Ct. App. 2008) .................................................................................*passim*

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ..................................................................................... 2, 4, 5

Defendant Saks & Company d/b/a Saks Fifth Avenue ("Saks" or "Defendant"), submits this reply memorandum of law in further support of its Motion to Strike the Class Allegations in Plaintiff's Second Amended Complaint ("SAC").

## I.   PRELIMINARY STATEMENT

Plaintiffs' opposition to strike the class allegations from this action turns on a simple, but demonstrably inaccurate premise, that Saks sales associates' earnings under a commission plan vest two weeks after sales are made and thus adjustments made to commissions after two weeks were unlawful. The commission plan, however, does *not* state that commissions vest two weeks after the sale of merchandise. To conclude they do would require extrinsic evidence outside of the plan. But to introduce such extrinsic evidence Plaintiffs first would have to show the plan is ambiguous. If it is, a *Pachter*-type inquiry into each and every putative class member's subjective understanding of the plan would be required. This would include an individual inquiry into whether each sales associate acquiesced in the way Saks applied the plan – as Plaintiffs themselves appear to have done for years. *See Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y.3d 609 (N.Y. Ct. App. 2008). Indeed, there is conflicting evidence as to when commissions were agreed to be "earned." Plaintiffs allege one thing, thirteen other Saks declarants claim another, and we do not know what hundreds of other putative class members would say – so an individualized inquiry is therefore unavoidable. Class treatment of Plaintiffs' claims is inappropriate for this reason alone.

Plaintiffs attempt to sidestep these inconvenient truths about their claims by largely remaining silent in the face of Saks' arguments. For instance, Plaintiffs completely fail to address dispositive case law holding that where, as here, an individualized *Pachter*-type analysis must be undertaken to determine when commissions are "earned," a case is inappropriate for class

treatment. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). Plaintiffs also fail to address how the many individualized experiences each sales associate has with commissions and returns could ever be suitable for class-wide treatment. Instead, Plaintiffs repeat various factual allegations in an attempt to show that they were subject to a common unlawful policy, ignoring evidence that directly contradicts each of those allegations and demonstrates that Plaintiffs' claims are individualized at their core.

For these reasons and as set forth herein and in Defendant's moving papers, Plaintiffs' claims remain individualized at their core, and their class allegations should be stricken.

## II. ARGUMENT

### A. Plaintiffs Ignore Case Law Requiring Individual Treatment of Their Claims.

Plaintiffs argue that the commission plan is an "express agreement between the parties" and that "it could not be clearer" that an employee's commission "vested" after two weeks, and that deductions made after that time are therefore unlawful. This is a fundamental misreading of Saks' commission plan in light of *Pachter*. But the commission plan does not say commissions are earned after two weeks. At most, Plaintiffs point out a potential ambiguity with regard to when commissions are earned. Thus, under *Pachter*, the Court must consider extrinsic evidence as to when the parties agreed that such commissions would be earned. That analysis is inherently individualized, and case law makes it clear that it is inappropriate for class treatment.

#### 1. Plaintiffs Fundamentally Misread Saks' Commission Plan.

Plaintiffs themselves undercut the "clarity" they allege in the commission plan: they argue that, under the "terms" of the plan, there are several different "possible outcomes as to when commissions vested and became earned wages." (Pl. Opp. Br. at p. 4). Indeed, if there were no ambiguity, no guesswork on several "possibilities" for when they were earned would be

necessary. Plaintiffs thus concede that the Court must consider additional evidence, under *Pachter*, to determine when commissions were agreed to be "earned."

Plaintiffs' misreading of the commission plan then leads them to another peculiar concession; namely, that they do not take issue with returns and deductions of commissions made under the commission plan, but only with returns and deductions of commissions made "contrary to the contract, such as after pay had vested in the employees as per the agreement, or when Defendant could not find the identity of the sales associate." (Pl. Opp. Br. at p.2). Rather than any language in the plan stating that commissions "vest" after two weeks, however, the plan simply says that commissions *will be* reduced by returns. Therefore, all deductions *are* made pursuant to the plan's express terms.

In addition, by limiting their claims to the deductions made "contrary to the contract" or taken after commissions are earned (or, "vested" as Plaintiffs argue) "as per the agreement," Plaintiffs only underscore that the proof of their claims is hopelessly individualized in nature. If, as Plaintiffs' arguments suggest, the commission plan is ambiguous as to when commissions are earned, the Court must consider extrinsic evidence, per *Pachter*, as to each and every class member's agreement, as a matter of contract, on when commissions would be "earned."

### 2.   Saks' Commission Plan Requires an Individualized Analysis of Each Plaintiff and Putative Class Member's Understanding.

A commission payment is only considered a "wage" when it is "earned," and is only "earned" in accordance with the parties' express or implied agreement. *Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y. 3d 609, 618 (N.Y. Ct. App. 2008). *Pachter* also holds that (i) extrinsic evidence of the parties' understanding; and (ii) evidence as to whether the employee "acquiesced" in employer's practice for judging an employee's commissions earned, can determine when the compensation is "earned." Plaintiffs' opposition readily acknowledges this:

3

> Extrinsic evidence of the parties' understanding and evidence as to whether the employee 'acquiesced' in the employer's practice for judging an employee's commissions earned can assist to determine when the compensation is earned. (Pl. Opp. Br. at p. 4).

This is another key admission for several reasons. First, Plaintiffs' Section 193 claim and Saks' defense against it both turn on the question of when commissions were "earned." This means that the understanding and agreement of each and every *individual* putative class member must be determined in this case. Indeed, taken together, Plaintiffs' allegations and Saks' declarations already demonstrate that different associates had different understandings and would be members of the putative class only based on those individual understandings – a classic sign of an impermissible "fail-safe" class. Importantly, these differences make it impossible for Plaintiffs to demonstrate, by way of generalized proof, the particular understanding or acquiescence of all putative class members. *Pachter* compels the parties to engage in individualized discovery of hundreds of sales associates to determine what the commission plan meant to each of them.

### 3. Plaintiffs Ignore Case Law Requiring Individual Treatment of Their Claims.

Plaintiffs completely ignore the case law which holds that an analysis of the implied understanding of compensation terms requires individualized evidence and precludes class treatment. *Vega*, 564 F.3d at 1260. *Vega*, which also dealt with chargebacks against commission, held that class treatment was inappropriate because it would force the court to conduct an individualized inquiry into the same issues that New York law requires to determine when commissions are earned under *Pachter*. Those issues included what each employee was told, the employees' subjective understanding of how each of them would be compensated, when each of their commissions would be subject to chargebacks, and when and how the compensation agreement or each employee's understanding of it changed over time. *Id.* at 1272.

4

By failing to distinguish or even address *Vega*, Plaintiffs all but concede that its rationale should apply here. Indeed, that decision, together with *Pachter* and its requirement of individualized proof, necessitates an inherently individualized inquiry as to each putative class member. Therefore, Plaintiffs' claims are simply unfit for class treatment.

### B. Contradictions between Plaintiffs' Allegations and Saks' Declarants Demonstrate that Plaintiffs' Claims are Individualized at Their Core.

Plaintiffs argue that Saks maintains an unlawful policy that was "widespread, and applied to all Plaintiffs equally, in the same manner." To support this, Plaintiffs proffer as "facts" the allegations of their own complaint. However, the question on this motion is not whether Plaintiffs' allegations are true; rather, it is whether Plaintiffs' claims will require the kind of individualized inquiry that makes class treatment inappropriate. In that regard, Plaintiffs' opposition completely ignores evidence, in the form of sworn declarations, which compel the conclusion that Plaintiffs' allegations *cannot* apply across the board. Indeed, an individualized controversy surrounds every allegation they make in support of class treatment. Specifically:

- *Plaintiffs allege that they were not compensated for deductions taken contrary to the contract, such as after pay had vested. (Pl. Opp. Br. at p. 2). Plaintiffs also argue that Saks could not take deductions after 60 or 90 days passed after the sale.*

This ignores the fact that the commission plan expressly states that commissions would be reduced by returns. Therefore, all reductions for returned merchandise were made in accordance with it. Moreover, by arguing that commissions vested after two weeks when the commission plan says no such thing, Plaintiffs suggest an ambiguity that requires, under *Pachter*, an individualized inquiry to determine each individual sales associate's understanding as to when it was agreed commissions were earned. (*See* Def. Mov. Br. at pp.9-11). This question would also apply to whether each individual sales associate understood that commissions were earned

sometime before, or after, any alleged 60 or 90 day period passed.

- ***Plaintiffs allege that their commissions were reduced when Saks could not find the identity of the sales associate who made the sale. (Pl. Opp. Br. at p. 2).***

The declarations on this point are to the contrary and thus demonstrate that any inquiry on this point would need to proceed associate by associate. Indeed, Saks' declarations establish it did not reduce commissions when the identity of the sales associate who made the sale could not be identified. (Christ Decl. ¶¶ 16, 28). Further, whether a sale can be identified depends on highly individualized factors such as whether the customer has a receipt (*Id.* ¶ 23), and if the customer does not have a receipt, whether the customer paid with a credit card (*Id.* ¶ 24), or cash (*Id.* ¶ 25). Moreover, if a customer paid by cash, whether a sale can be identified also depends on whether the customer agreed to provide name and identifying information at the time of purchase. (*Id.* ¶ 25). If the sale still cannot be identified, reduction of commission will ultimately depend on whether Saks' Client Services department is able to, and does, take further steps to identify the sale. (*Id.* ¶ 26). The steps that Saks' Client Services takes in each situation will further vary and require its own individualized analysis. Finally, even if commissions are reduced when the identity of the sales associate is not determined, each Sales Director has individualized discretion to decide whether a commission is ultimately reduced. (*Id.* ¶¶ 29-32). What Plaintiffs fail to grasp is that every step of this process depends on individualized factors that must be analyzed to determine whether any particular associate should be a class member in the first place.

- ***Plaintiffs allege that all sales associates were subjected to the same commission system and all had "unexplained returns" deducted from their pay, including returns due to mistakes in the alterations department, returns of items without a sales receipt, returns made wherein the identity of the original seller was unknown, and returns made after the date specified in the return policy. (Pl. Opp. Br. at p. 2).***

6

Plaintiffs ignore that Saks' declarations establish that sales associates are *not* all subjected to reduced commissions from returns, and the question of whether their commissions were actually reduced is a highly individualized matter. Specifically, Plaintiffs fail to respond to the fact that Directors have individual discretion, (which itself will vary from Director to Director) to disallow reductions to commissions for any reason (the "productivity adjustment"). (Cantone Decl. ¶ 18; Seltzer Decl. ¶¶ 15-16; Niang Decl. ¶ 13). This discretion has functioned to disallow reductions to commissions in the precise situations that Plaintiffs describe; e.g. alteration mistakes, returns made without a sales receipt, and where the seller is unknown. (Christ Decl. ¶¶ 29-32; Whittaker Decl. ¶¶ 14-15; Fuller Decl. ¶ 25; Bleibdrey Decl. ¶ 16; Brunelle Decl. ¶¶ 29-30; Seltzer Decl. ¶¶ 15, 17; Khan Decl. ¶ 13; Gignac Decl. ¶¶ 15-16; Speer Decl. ¶¶ 13-14; Cantone Decl. ¶ 18; Niang Decl. ¶ 13).

Plaintiffs also fail to address other specific instances when Directors use individual discretion to apply productivity adjustments, such as when a return is accepted even though a product is clearly worn but the tag is still on. (Whittaker Decl. ¶ 13; Cantone Decl. ¶ 19). Further, sometimes a commission is adjusted because of a mistake – such as when an associates rings a sale under another associate's identification number, (Whittaker Decl. ¶ 15; Gignac Decl. ¶ 16; Seltzer Decl. ¶ 17; Khan Decl. ¶ 13; Niang Decl. ¶ 13), an associate "steals" a sale of another associate, (Brunelle Decl. ¶ 30; Speer Decl. ¶14), or when it is simply fairer to split a commission. (Seltzer Decl. ¶ 16; Niang Decl. ¶ 13). Such individual discretion would yield different results on an associate-by-associate, sale-by-sale basis.

Plaintiffs make much of the 60- or 90-day time periods on returns in their opposition. They appear to make the argument – relying on nothing but thin air – that these time periods constitute the time after a sale when commissions were earned (or, "vested" as Plaintiffs put it).

7

Plaintiffs once again ignore that fact that the commission plan does not say that commissions are earned after two weeks, 60 days, or 90 days, and Plaintiffs are, at best, pointing out an ambiguity with regard to when commissions are earned. As a result, under *Pachter*, an individualized inquiry is required to determine each individual sales associate's understanding as to when it was agreed commissions were earned. (*See* Def. Mov. Br. at pp. 9-11). Moreover, even if the plan actually said commissions were earned after two weeks, 60 days, or 90 days, the Court would still need to determine whether that time period passed with regard to every return, and as to every Plaintiff or putative class member.

Further, even if it is Plaintiffs' understanding that commissions were agreed to be earned after two weeks, 60 days, or 90 days passed, that understanding is directly contradicted by the sworn declarations of other Saks employees. That contradiction demonstrates that an individualized inquiry into what the several hundred sales associates (by Plaintiffs' count) who form the putative class understood and agreed to, is required. The fact remains that there are several sales associates who were presented with, understood, and agreed to, the terms of the commission plan at the time they were hired. (Bleibdrey Decl. ¶¶ 7, 9-11; Mayon Decl. ¶¶ 6, 8-10; Lebron Decl. ¶¶ 8, 10-12; McCall Decl. ¶¶ 6, 8-10; Speer Decl. ¶¶ 6, 9-10; Cantone Decl. ¶¶ 8, 10-11, 13; Seltzer Decl. ¶¶ 7, 9-11; Khan Decl. ¶¶ 7, 9). These associates have clearly agreed to the way commissions are reduced and Plaintiffs cannot speak for any of them. There are hundreds of other Saks associates that may or may not agree – but that is exactly the point. An inquiry will need to be conducted into whether each and every one of them do or do not.

- ***Plaintiffs allege that they worked extra hours for which they received no compensation including when they were required to attend hour long department and store meetings once a week, remain on the floor selling items after they had clocked out, work special events and promotions like fashion shows, and attend store events. (Pl. Opp. Br. at p. 3).***

8

Far from there being a common requirement or policy that applies to all sales associates, each and every one of these allegations is directly contradicted by Saks' declarations. Each putative class member's claims would arise, if at all, from one-off occurrences that clearly vary from individual to individual. Contrary to Plaintiffs' experiences, there are other sales associate who are clocked in during the time spent at events like meetings, special events, promotions, and shows. (Bleibdrey Decl. ¶ 23; Brunelle Decl. ¶ 12; Fullmer Decl. ¶ 6; Gignac Decl. ¶ 21; Khan Decl. ¶ 22; LeBron Decl. ¶ 23; Mayon Decl. ¶¶ 24-25; McCall Decl. ¶¶ 26-28; Niang Decl. ¶¶ 25-27; Seltzer Decl. ¶ 25; Speer Decl. ¶ 23; Whitaker Decl. ¶¶ 16-18). Moreover, attending events like fashion shows after hours are completely voluntary, and each sales associates can make the individual decision to attend on their own time and for their own benefit. (Bleibdrey Decl. ¶ 25; Brunelle Decl. ¶¶ 13, 16; Cantone Decl. ¶¶ 29-30; Fulmer Decl. ¶ 8). Further contradicting Plaintiffs, there are sales associates who clock in and out on time and have not been pressured or incentivized to work while not clocked in. (Bleibdrey Decl. ¶¶ 20-22; Brunelle Decl. ¶ 32; Cantone Decl. ¶¶ 25-28; Fulmer Decl. ¶ 6; Gignac Decl. ¶¶ 18-21; Khan Decl. ¶¶ 17-20; LeBron Decl. ¶¶ 19-22; Mayon Decl. ¶¶ 19-22; McCall Decl. ¶¶ 21-25; Niang Decl. ¶¶ 22, 24; Seltzer Decl. ¶¶ 21-24; Speer Decl. ¶¶ 19-22; Whitaker Decl. ¶ 20). Finally, even when there is evidence that an employee worked off the clock, the declarations show that it is for a small amount of time, specifically in situations when a customer approaches them right after the sales associate clocks out or right before the sales associate clocks in. (Khan Decl. ¶ 20; Niang Decl. ¶ 23). The Court will therefore need to delve into each individual experience for all of these situations, not only to determine class membership, but also to determine liability. (*See* Def. Mov. Br. at pp. 23-24).

- *Plaintiffs allege that they did not acquiesce to returns that were deducted under the terms of the commission plan. (Pl. Opp. Br. at p. 5).*

9

Maybe so – but again, Plaintiffs ignore *Pachter*'s requirement that an individualized inquiry into each individual sales associate's understanding is needed to determine when commissions were earned. By working for years without complaining, Plaintiffs themselves acquiesced to Saks' practice of reducing their commissions. This clearly stands at odds with Plaintiffs' current allegations that they had a different understanding as to how they should have been paid. This is *Pachter*'s holding and Plaintiffs simply ignore it.

### III. CONCLUSION

Plaintiffs' opposition largely ignores the crux of the issue on this motion and the evidence in support of it: Saks' commission plan is not unlawful on its face but, instead, could only work an unlawful *effect* if it were applied to specific individuals in specific ways. This specificity can only be established via individual, associate-by-associate inquiries – which is the hallmark of an inappropriate putative class. For the foregoing reasons, along with those set forth in Defendant's moving papers, Defendant respectfully requests that Plaintiffs' Motion to Strike the Class Allegations be granted.

Dated: New York, New York  
December 21, 2015

**KELLEY DRYE & WARREN LLP**

By: _____s/John P.J. Mattiace_____  
Mark A. Konkel  
Robert I. Steiner  
John P.J. Mattiace  

101 Park Avenue  
New York, New York 10178  
rsteiner@kelleydrye.com  
mkonkel@kelleydrye.com  
jmattiace@kelleydrye.com  
(212) 808-7800  
(212) 808-7897 (Facsimile)  

*Attorneys for Defendant*